UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

LATRINA M. CAIN,

        Plaintiff,

        v.                                   Case No. 06-C-0489

AIRTRAN AIRWAYS,

        Defendant.

ORDER GRANTING DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT (Doc. # 29)

Plaintiff, Latrina Cain, was employed by defendant AirTran Airways ("AirTran") between July 31, 2003, and November 4, 2003. She alleges that during her employment she was subjected to sexual harassment, racial harassment, and unlawful retaliation. She brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Before the court is AirTran's motion for partial summary judgment on Cain's racial harassment and unlawful retaliation claims.

I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. BACKGROUND[1]

---

[1] Five related cases, including this one, were brought by former AirTran employees against AirTran—*Dalton v. Airtran Airways*, Case No. 06-CV-348 (E.D. Wis); *Jensen v. AirTran Airways,* Case No. 06-CV-350 (E.D. Wis.); *Henneman v. AirTran Airways*, Case No. 06-CV-368 (E.D. Wis.); *Ott v. AirTran Airways*, Case No. 06-CV-371 (E.D. Wis.); *Cain v. AirTran Airways*, Case No. 06-CV-489 (E.D. Wis.). While these cases have not been consolidated, the defendants moved for summary judgment in all cases, and the parties consolidated briefing for all summary judgment motions. This resulted in nearly 1300 proposed findings of fact submitted by the parties (293 for the defendants, 1096 by the plaintiffs), along with over one thousand pages of response materials and supporting documents. And, while the parties have submitted a very limited set of stipulated facts, most of their proposed findings of fact are disputed. Navigation of the record has therefore been a substantial and time-consuming endeavor.

With that in mind, the court has relied on the parties' set of stipulated facts, as well as each side's proposed findings of fact to the extent that they are undisputed, or that any alleged dispute is immaterial, unsupported, or otherwise not compliant with the local rules. Stipulated proposed findings of fact are designated as "SPFOF"; Defendant's proposed findings of fact are identified as "DPFOF"; and plaintiff's proposed findings of fact are identified as "PPFOF."

2

AirTran is a low-fare commercial airline that has operated out of Milwaukee since June 2002. It has corporate offices in Orlando, Florida and Atlanta, Georgia. The Milwaukee station operates with about twenty-five employees. This includes a station manager, which is the top spot, followed by two or three station supervisors. All other employees carry the title of customer service agent.

Latrina Cain, who is African American, was a customer service agent for AirTran in Milwaukee between July 31, 2003, and November 4, 2003. Terese Sellers was the station manager for AirTran between March 6, 1999, and February 4, 2005. Tom Cross was a station supervisor for AirTran from May 31, 2002, to October 13, 2006.

Decisions regarding hiring, promotions, transfers, layoffs, recalls, discipline, scheduling, and discharge of customer service agents are made by the Milwaukee station manager or a human resources officer at AirTran's corporate headquarters. Station supervisors may assign personnel to various tasks and may issue Employee Discipline Reports and Attendance Review Forms (reflecting absences or tardiness). For the most part, station supervisors perform their tasks alongside customer service agents.

AirTran maintained written employment policies in its Crew Member Handbook, which was updated periodically. (*See* Def.'s Ex. 1.) Specifically, it included written policies regarding equal employment opportunities and sexual harassment. For the most part, all new AirTran employees receive a copy of the then-current Handbook during their initial company training in Atlanta. This was true for Cain. (SPFOF ¶ 26). Updated versions of the Handbook are mailed to each station and distributed to the employees. (DPFOF ¶ 17.) In addition, electronic versions of the Handbook are available online

3

through the company's intranet service, and the company's anti-harassment policies are posted throughout the employee break areas and behind the ticket counter. (*Id.* ¶¶ 18-19.)

As noted, Cain started work as a customer service agent on July 31, 2003. During her employment, Cain complained formally at least twice to Sellers about Cross's allegedly inappropriate behavior (discussed below). (PPFOF ¶ 1041.) One of her formal complaints was made on or around November 1, 2003.[2] (DPFOF ¶ 281.) According to Cain, Sellers did not take any action regarding her complaints. (*Id.* ¶ 286.) After she complained to Sellers, however, Cross's attitude changed. For instance, when talking to other employees, Cross referred to Cain as a "snitch bitch" and commented that "it wouldn't be long before [Cain] got fired." (Pl.'s Ex. 5 at 244-45, 287-88.) Around that same time, a fellow employee mentioned to Cain that she "better watch [her] times, [her] punches, because Tom was looking for any reason to get rid of [her]." (*Id.* at 244.) Thereafter, Cain decided she was not going to go back to AirTran. (*Id.* at 285-86.) On November 4, 2003, Cain was scheduled to work, but she did not come in and did not notify AirTran that she would be absent. (DPFOF ¶ 272.) Cain did not return to AirTran, and on November 10, 2003, AirTran determined that Cain voluntarily resigned as of November 4, 2003. (*Id.* ¶ 273; Def.'s Ex. 134.)[3]

---

[2] Cain states that she complained formally to Sellers at least twice, but she does not indicate when. While Cain's Complaint in this action alleges that this meeting with Sellers occurred "on or about November 1, 2003," (Compl. ¶ 80), Cain testified that she is not certain of the date, (Pl.'s Ex. 5 at 118-121.) In any event, Cain does not challenge AirTran's contention that she expressed her grievances to Sellers on or around November 1, 2003. (DPFOF ¶ 281; *see also* Pl.'s Ex. 5 at 121, 244-46, 283.)

[3] In her response to the defendant's proposed findings of fact paragraphs 270-73, 281, Cain states "deny," but she does not actually dispute the substance of the proposed facts or present evidence indicating a material issue of fact.

4

III. DISCUSSION

Cain brings suit alleging race discrimination, in the form of a hostile work environment, and unlawful retaliation under Title VII and 42 U.S.C. § 1981. For relevant purposes, courts employ a similar standard when addressing race discrimination claims under Title VII and § 1981. *See Walker v. Mueller Indus., Inc.*, 408 F.3d 328 (7th Cir. 2005) (addressing claims for hostile work environment and retaliation); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004) ("Because we evaluate § 1981 claims under the same rubric as Title VII claims, we need not address them separately.").

A. Hostile Work Environment

Cain asserts that she was subjected to a racially hostile work environment due to the conduct of Tom Cross, a station supervisor. To survive summary judgment, Cain must "present evidence that, if believed by a trier of fact, would show that [the defendant's] conduct was 'severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Ford v. Minteq Shapes and Services, Inc.*, 587 F.3d 845, 847 (7th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009); *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004). Whether a plaintiff's work environment is hostile or abusive "depends on factors that 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Ford*, 5878 F.3d at 847 (quoting *Harris*, 510 U.S. at 23).

Here, Cain asserts that during an approximately two-month time frame, Cross made racist comments to her and others at AirTran "all the time." For summary judgment

5

purposes, she points to several specific instances. First, she asserts that she overheard Cross use the "N-word" when talking with other customer service agents. Next, Cain asserts that around Halloween 2003, she and several other employees were in the operations center when Cross made a mask out of a sheet of paper and cut out eyes and a mouth. He also had a piece of rope with loose ends, which he put over his neck. Cross then started telling a story to the employees that included comments about how slavery still existed in the south—Cain stated that she "can't even remember the exact story . . . he was telling everyone," but she affirmed that Cross used the term "KKK" at some point. (Pl.'s Ex. 5 at 271-74.) In addition, Cain notes that Cross stated he was not racist, but that his grandparents were racist and that "if he ever "took a black girl to his grandparents they would lynch her." (*Id.* at 275-76.) According to Cain, Cross also mentioned that his grandparents do not approve of "mixed-race" children, and Cross expressed his belief that mixed-race children are "going to be confused." (*Id.* at 277.)

Moreover, Cain asserts that Cross made several comments that are both racially and sexually offensive. She states that Cross mentioned that "white women have better titties than black women, but that black women have better asses than white women." (*Id.* at 33.) He also mentioned to Cain that she "had perfect titties to be a black girl." (*Id.* at 166.)[4]

---

[4] Cain also includes in this section of her brief several incidents of alleged sexual harassment. These alleged incidents, however, are not material to her race discrimination claim inasmuch as they have no apparent relationship to her race—they may be related to Cain's claim for sexual harassment, but that claim is not the subject of AirTran's motion for summary judgment. *See generally Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 863 -864 (7th Cir. 2005) ("[T]he alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004)). Cain presents no authority supporting her assertion that the court should read a racial aspect into conduct that otherwise reveals none.

6

There is little doubt that, assuming the facts in favor of Cain, the comments and actions described above are inappropriate and offensive. Still, these incidents appear isolated, and, taken together, were neither sufficiently severe or pervasive to rise to the level of actionable harassing conduct. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720 (7th Cir. 2009) (noting that isolated incidents of non-severe conduct will not constitute actionable harassing conduct). And, despite Cain's contentions, the record indicates that Cross's comments were, for the most part, not directed at her specifically. *See McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 (7th Cir. 2000) ("When such harassment is directed at someone other than the plaintiff, the 'impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.'" (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997)). Cross's use of the "N-word" was apparently careless chatter that, while awkward and insensitive, is untied to racial animus. According to Cain's testimony, he used this word "a couple of times" and in a conversational manner—Cain stated that Cross was "[n]ot like calling them that" but "playing, . . . like he was a black man talking to another black man, using that word." (Pl.'s Ex. 157, 278.) Also, while Cross's remarks about "the KKK" and his grandparents' racist beliefs may have offended Cain, nothing indicates racial animus directed at Cain. Moreover, it appears that Cross's race-related comments were not physically threatening or humiliating, and did not interfere with Cain's work performance. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566-67 (7th Cir. 2004) ("[T]he mere utterance of an epithet which engenders offensive feelings in an employee is not sufficient to establish a hostile work environment.'" (quoting *McPhaul,* 226 F.3d at 567). *Cf. Porter,* 576 F.3d at 636 ("In this case, the presence of multiple nooses and the veiled threats by Mr. Porter's

7

coworkers, which caused Mr. Porter to fear for his own safety and that of his family, rose to the level of a hostile work environment."). Therefore, Cain cannot survive summary judgment on this claim.

B. Retaliation and Constructive Discharge

Cain next asserts that AirTran unlawfully retaliated against her after she complained to Sellers on or around November 1, 2003, about Cross's behavior.[5] Cain's retaliation claim is based on her alleged "constructive discharge," which flowed from "harassment and a hostile work environment." (Pl.'s Br. 80.)

To support a retaliation claim, the plaintiff must have suffered an adverse employment action, which can include constructive discharge. *Williams*, 361 F.3d at 1031-32. "To establish a claim for constructive discharge under Title VII, a plaintiff must prove that [her] working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Further, the "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because 'in the ordinary case, an employee is expected to remain employed while seeking redress.'" *Id.* (citing *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)); *see Pa. State Police v. Suders*, 541 U.S. 129, 134 (2004) (noting that in addition to demonstrating a hostile work environment, the plaintiff must make "a further showing" to establish a constructive discharge). "[T]he primary rationale behind

---

[5] As noted, Cain states that she complained formally to Sellers at least twice, but she does not indicate when these complaints took place. In any event, the only incidents that Cain puts forward in her brief in support of her retaliation claim are alleged to have occurred after she complained to Sellers near the end of her employment. (Pl.'s Br. 79-80; Pl.'s Ex. 5 at 244-46, 284-85.)

8

the heightened standard in constructive discharge cases is to permit an employer to address a situation before it causes an employee to quit." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007); *see also Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1035-36 (7th Cir. 2006); *Saxton v. AT&T*, 10 F.3d 526, 536-37 (7th Cir. 1993) ("An employer constructively discharges an employee only if it *makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (citing *Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 426 (7th Cir.1989)).

As previously noted, Cain fails to put forward evidence on which a jury could conclude that she was subjected to a hostile work environment based on her race. Therefore, her constructive discharge claim must fail absent substantial evidence on top of that already discussed. *See Suders*, 542 U.S. at 149 ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case."); *Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007); *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 463 (7th Cir. 2007). Facing this hurdle, Cain submits additional incidents that occurred after she complained to Sellers that led to her constructive discharge. (Pl.'s Br. 80.)[6]

First, Cain states that at some point, she overheard Cross refer to her as a "snitch bitch" and state that "it wouldn't be long before [she] got fired." (Pl.'s Ex. 5 at 244-45.) She also overheard Cross "sa[y] something about me having something up my ass,

---

[6] In a footnote in her brief, Cain "refers the Court to plaintiff's proposed findings of fact for a full analysis of the facts relevant to Ms. Cain's claims." While the court has reviewed the proposed findings of fact (and the evidentiary materials cited in support thereof) that Cain cites in her brief as supporting various allegations, it has not independently scoured all 1096 of plaintiff's combined proposed findings of fact for items that may somehow be relevant to Cain's claims. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("We have repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

9

I can't take a joke." (Pl.'s Br. 79; Pl.'s Ex. 5 at 246.) In addition, Cain points to an incident that occurred near the end of her employment when she reported to a supervisor's office to take a written test regarding procedures on the ramp. (DPFOF ¶¶ 287-88; Pl.'s Ex. 248-49.) Cross was administering the exam, and when Cain approached Cross for her copy of the test, Cross "just like slung the ramp test at me and it fell off of his desk and onto the floor." (Pl.'s Ex. 5 at 368.) Cain responded to Cross that she "was not a dog and [she] was not going to pick it up." (*Id.* at 250, 370.) Another employee who was in the office with Cain and Cross retrieved Cain's test from the floor. (*Id.* at 250, 371.) Cross then stated that "it was mandatory that everybody took the test, and whoever did not take it would be fired." (*Id.* at 371.) Cain took the test and left. As of November 4, 2003, Cain stopped reporting to work at AirTran.

These actions, however, fall far short of establishing conditions that were "so intolerable that a reasonable person would be forced into involuntary resignation." Indeed, Cain testified that after she complained to Sellers, Cross became more serious: "the chippery playful Tom [Cross] turned into the serious supervisor. . . . He just turned into, like, kind of a nasty attitude. He turned into this serious person versus this playful person, I guess." (*Id.* at 245.) Further, Cain testified that after her complaint to Sellers, Cross did nothing in her presence that she considered sexually or racially inappropriate. (*Id.* at 287-88.)

The court rejects Cain's assertion that she was constructively discharged because she believed she was about to be fired. "[W]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive

10

discharge." *See EEOC v. Univ. of Chi. Hosp.*, 276 F.3d 326 (7th Cir. 2002). In *EEOC v. University of Chicago Hospitals*, which Cain relies on for support, the plaintiff demonstrated that a reasonable employee in her position would have believed that had she not resigned, she would have been terminated. In that case, the record showed that one of the plaintiff's supervisors repeated a desire to have the plaintiff fired (or force the plaintiff to quit), that supervisor fired the plaintiff's immediate supervisor for failing to dismiss the plaintiff, the plaintiff was warned of imminent termination by her employer, and, when the plaintiff arrived at work on what turned out to be her last day, her belongings were packed and her office was being used for storage. 276 F.3d at 329-30, 332.

In contrast, Cain's contentions are limited to overhearing Cross mention to another employee that "it wouldn't be long before [Cain] got fired" and other employees warning Cain to be careful around Cross. Cain points to no admissible evidence indicating that Cross intended to fire her; indeed, Cross had no authority to fire Cain. To assume Cross had the pull to have Cain fired (or even embarked on such an endeavor) requires assumptions that have no support in the record—Cain's testimony that another employee warned her to "watch [her] times, [her] punches, because Tom was looking for any reason to get rid of [her]" is inadmissible hearsay to the extent it is offered for the truth of the matter asserted.[7] *See* Fed. R. Evid. 802; Fed. R. Civ. P. 56(e); *see generally Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009). Regardless, the Seventh Circuit in *Cigan v. Chippewa Falls School District* rejected the argument that *EEOC v. University of Chicago*

---

[7] Cain's cites to her testimony regarding what "John" told her about Cross's intentions as evidence that Cross "was on the verge of terminating her employment." (Pl.'s Br. 80; PPFOF ¶ 1087; Pl.'s Ex. 5 at 244.) In addition, Cain alleges that other employees at AirTran warned her during her employment that Cross could find ways to fire people if they did not like his jokes. (Pl.'s Br. 79-80; Pl.'s Ex. 5 at 155-56). This also is inadmissible hearsay to the extent it is offered for the truth of the matter asserted, and, in any event, it is not clear how such rumors relate to Cain's retaliation claim.

11

*Hospitals* supports a finding of constructive discharge where a history of unendurable working conditions is not evident. 388 F.3d 331, 333 (7th Cir. 2004) (dismissing plaintiff's contention that she was constructively discharged when her employer notified her that he was seeking her termination; the court noted that such a position "would take us a long distance indeed from 'unendurable working conditions' and require the courts to engage in speculation"). Without more, Cain cannot show constructive discharge, and her retaliation claim fails. Therefore,

IT IS ORDERED that AirTran's motion for partial summary judgment is granted.

IT IS FURTHER ORDERED that a status conference in this matter is set for Thursday, April 15, 2010, at 11:30 AM.

Dated at Milwaukee, Wisconsin, this 9th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

12

Case 2:06-cv-00489-CNC   Filed 03/09/10   Page 12 of 12   Document 59